In re PURCO, INC. t/d/b/a Tri State Insulation, Inc. and t/d/b/a Speco Marketing, Debtor.

Vedder J. WHITE, Esq.,
Trustee, Plaintiff,

v.

Marlin K. COON, Coon Refrigeration, Inc., Defendants.

Vedder J. WHITE, Esq.,
Trustee, Plaintiff,

v.

Marlin K. COON and Coon Refrigeration, Inc., Defendants.

Vedder J. WHITE, Esq.,
Trustee, Movant,

v.

Marlin K. COON, and Coon Refrigeration, Inc., Respondents.

Bankruptcy No. 83–00544E.
Adv. Nos. 84–0097, 85–0004.

United States Bankruptcy Court,
W.D. Pennsylvania.

July 28, 1987.

Vedder J. White, trustee, Erie, Pa., pro se.

John W. Beatty, Erie, Pa., for defendants, Marlin K. Coon and Coon Refrigeration, Inc.

OPINION ON TRUSTEE'S COMPLAINT TO RECLAIM PROPERTY OF THE DEBTOR, TO AVOID CERTAIN LIENS AND SUBORDINATE CLAIMS OF COON AND COON REFRIGERATION, TO RECOVER PROCEEDS OF THE SALE OF DEBTOR'S ASSETS, AND ON TRUSTEE'S PETITION TO ABANDON PROPERTY

WARREN W. BENTZ, Bankruptcy Judge.

## MOTION FOR ABANDONMENT

### Case Summary

Before this Court are three interrelated proceedings instituted by the Trustee in the above bankruptcy case. The Trustee, on July 25, 1984, filed a complaint (Adversary No. 84–0097) to reclaim property of the Debtor and to avoid certain liens upon that property. This complaint alleged, *inter alia*, that various judgment notes, security agreements, and financing statements given by the Debtor, Purco, Inc. ("Purco") to Marlin K. Coon ("Coon") and Coon Refrigeration, Inc. ("Coon Refrigeration") were fraudulent conveyances, or must be deemed to be contributions to capital, or were executed without requisite corporate authority.

The Trustee, on January 23, 1985, filed a second complaint (Adversary No. 85–0004) seeking to recover from Defendants Coon and Coon Refrigeration some $21,320, being the proceeds of their postpetition sale of a 1977 GMC truck, attached equipment and inventory thereon, alleged to have been part of the Debtor's estate. Count II of this complaint essentially restated the Trustee's position in his first complaint, i.e., that the claims and liens of Coon and Coon Refrigeration were invalid as a fraudulent conveyance under state law, that the liens were granted in violation of applicable corporation law and that the claims of Coon and Coon Refrigeration and should be equitably subordinated to the claims of other creditors. Counts III and IV of this complaint were withdrawn.

The final matter requiring disposition in this case is the Trustee's Petition (Motion) to Abandon Property filed March 15, 1985. Specifically, the Trustee wishes to abandon certain inventory located on the real property owned by Coon Refrigeration which was alleged to constitute a hazardous waste under the laws of the Commonwealth of Pennsylvania. The security agreements, even if they are determined to be valid, do not specifically cover this inventory. Defendants therefore assert they have no interest in the inventory. If the inventory is abandoned by the trustee, then the problem of its disposal will be that of (1) the empty corporate shell of Purco, Inc., and (2) the owner of the real estate, i.e., Coon Refrigeration. Defendants Coon and Coon Refrigeration therefore oppose such abandonment.

All of the foregoing matters were heard by this Court together for convenience of administration, notwithstanding the fact that the matters were never consolidated by a formal motion. The matters were considered on March 15, 1985 by the Honorable William B. Washabaugh, Jr. and further hearings were held before the undersigned.

### Facts

Prior to October of 1979, Coon Refrigeration, Inc., in addition to its refrigeration business, operated a division called "Tri-State Insulation, Inc. Division," which engaged in the business of applying polyurethane and elastomeric insulation coatings. Thomas Purvis was a sales person for such products. In October, 1979, Purvis and Coon commenced business as "Tri-State Insulation, Inc." and attempted to incorporate under that name. Because of the unavailability of that name, the name "Purco, Inc." was used, and articles of incorporation were approved by the state on April 11, 1980.

The capitalization of the new corporation was as follows:

(a) Coon Refrigeration, Inc. transferred the assets of its "Tri-State Insulation, Inc. Division" being equipment, vehicles and inventory of a value of $135,000 to Purco,

Inc., and took back a note for $135,000. Marlin Coon intended that all of the assets of Purco should be subjected to a lien to secure the $135,000 note, and his failure to obtain such lien was through inadvertence.

(b) 500 shares of $1 par stock was issued to Marlin Coon and the same amount to Thomas Purvis. No payment was made for the stock initially. In 1981, Purco was threatened by unpaid creditors; Coon and Purvis met with their lawyers and accountants and upon their recommendation, executed promissory notes of $10,000 each to Purco to be able to show some capital invested. Evidence as to whether these notes were ever paid is unclear.

Coon Refrigeration, Inc. is wholly owned by Marlin Coon.

Coon Refrigeration also leased to Purco the portion of the premises owned by Coon Refrigeration from which its "Tri-State Insulation, Inc. Division" had previously conducted business.

Gross sales of Purco for the fiscal year ended September 30, 1982 were $1,812,721.

On October 1, 1982, Coon executed renewal notes in higher amounts as President of Purco in favor of himself and Coon Refrigeration. Coon also caused Purco to execute security agreements and financing statements in favor of himself and Coon Refrigeration which purported to impose liens upon all of the equipment and vehicles of Purco. The financing statements were executed and filed October 20 and 21, 1982. Purvis was not present at any shareholder meeting and was not given the opportunity to vote on any resolution authorizing Purco to execute the notes, security agreements, or financing statements.

On November 15, 1983, Purco ceased to do business and pursuant to the security agreements, Coon, on behalf of himself and/or Coon Refrigeration took possession of Purco's assets. Purco filed its bankruptcy petition on December 18, 1983.

After the bankruptcy filing, Coon sold the 1977 GMC truck and the attached equipment and inventory thereon on July 27, 1984 to one Stanley Lutz ("Lutz") for $21,320 and retained the proceeds. The truck and equipment were among the items initially transferred to Purco as part of the $135,000 of equipment, vehicles and inventory, but the owner's name on the vehicle title certificate was not changed.

On September 24, 1984, the Pennsylvania Department of Environmental Resources, Bureau of Solid Waste Management, ("DER") issued a Notice of violation of the Pennsylvania Solid Waste Management Act (the "SWMA") and the rules and regulations promulgated under that Act and served the Notice by certified mail upon the Trustee, Coon, Purvis, and Coon Refrigeration. The Notice alleged *inter alia* that staff inspections of the site upon which the Debtor operated its business disclosed the presence of solid wastes, that the storage and/or disposal of such wastes requires a permit, and that neither Purco, Coon Refrigeration, Coon, nor Purvis had such a permit.

*Issues*

I. Whether the renewal notes and security agreements executed in October of 1982 are invalid, as a matter of corporate law as having been executed without requisite corporate authority or as voidable by the trustee as a fraudulent conveyance within the meaning of the Pennsylvania Uniform Fraudulent Conveyance Act.

II. Whether the security interest and ultimately the claims of Coon and Coon Refrigeration may be equitably subordinated to the claims of other creditors.

III. Whether the 1977 GMC truck and attached equipment was part of the estate so as to enable the Trustee to recover the proceeds of the postpetition sale thereof from Coon and Coon Refrigeration.

IV. Whether the Trustee may abandon inventory which is property of the estate as burdensome to the estate pursuant to 11 U.S.C. § 554 where such inventory may be hazardous waste, located on the premises of the debtor's landlord who may also be the original owner of some of the inventory, and where the landlord is a corporation owned by the same person who exercised control over the debtor corporation.

## Discussion

### I. Fraudulent Conveyance

The Trustee argues that the attempt to transfer a security interest in virtually all of the Debtor's personal property by Coon as President and Secretary of the Debtor to Coon individually and to Coon Refrigeration constitutes a fraudulent conveyance which he may avoid. The security agreements were executed on October 1, 1982 and financing statements were filed October 23, 1982. Since the bankruptcy petition was filed December 23, 1983, more than one year after the purported conveyance of the security interest, the Trustee is without the benefit of 11 U.S.C. § 547 which permits the Trustee to avoid certain transfers to insiders occurring within one year of the filing of a bankruptcy case. Nevertheless, a trustee in bankruptcy is authorized to proceed under state fraudulent conveyance statutes by virtue of 11 U.S.C. § 544(b) which provides:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

The Trustee looks to the Uniform Fraudulent Conveyance Act as enacted in Pennsylvania at 39 Pa.Stat. § 351 et seq. ("Title 39"). We believe that the Trustee may avoid the conveyance here at issue under sections 354, 355, or 357 of Title 39. We will discuss each section in turn.

### A. Section 354

Section 354 states that "every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." The two-fold question is whether the conveyance (i.e., transfer of the security interest) was made at a time when the debtor was insolvent and if so, whether the conveyance was for fair consideration.

Insolvency for purposes of fraudulent conveyance law is defined as follows:

> A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

■ Purco was insolvent from its inception. The asserted value of the equipment and inventory which Coon transferred to Purco was $135,000, exactly equal to the promissory note issued by Purco to Coon and Coon Refrigeration in payment thereof. $1,000 of capital stock was issued but no payment was made. Hence, Purco was launched with no capital. Accrual of five minutes rent, or five minutes of accrued wages, or the slightest purchase rendered Purco insolvent. From the commencement of the business with no capital, Purco's financial condition deteriorated until 1981 when Coon and Purvis met with their lawyers and accountants because of threats by unpaid creditors. The $10,000 note executed by Purvis, and the $10,000 note executed by Coon, even if paid (as to which the evidence is uncertain), were insufficient by that time to stabilize the company or put it into a solvent situation. Purco was, in October, 1982, when the security agreements were executed and perfected, insolvent.

The security agreements did not create new debt; they purported to secure the pre-existing debt with a lien on all of Purco's assets.

■ Having found Purco to be insolvent at the time of the conveyance of the security interest, we must determine whether the conveyance was for fair consideration.

Fair consideration is defined at § 353(b) of Title 39:

> Fair consideration is given for property or obligation
> (b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

The securing of antecedent debt has been held to be fair consideration. *See Inland Security Company, Inc. v. Estate of Kirshner,* 382 F.Supp. 338, 1974 (W.D.Mo.). The fact that value of the property subject to the conveyance of the security interest was equivalent, or at least not disproportionately small compared to the amount of the antecedent debt may be inferred from the failure of the trustee to dispute the values assigned to assets covered. But the question here was whether the obligation was incurred in good faith. Before a finding of fair consideration can be made, a court must first find that the transferee acted in good faith, *Cohen v. Sutherland,* 257 F.2d 737, 742 (2d Cir.1958). Whether a transfer was in good faith depends upon whether, under the circumstances, the transaction carries the earmarks of an arm's length bargain, *Bullard v. Aluminum Co. of America,* 468 F.2d 11, 13 (7th Cir.1972). Good faith may be lacking because of a transferee's position as an insider with control of the corporate finances, *In re Carousel Candy Co., Inc.,* 38 B.R. 927, 936 (Bkrtcy.E.D.N.Y.1984). The relevant text of *Carousel Candy* is informative: "the transfers were made by persons who controlled the debtor, not for the benefit of any of the creditors but in the imminence of insolvency to remove the assets from the reach of creditors and preserve them for their own enjoyment or purposes ... When defendants realized that the debtor was beyond hope of revival, they decided to strip it of saleable assets and to help themselves, and no one but themselves, to the proceeds." *Id.* at 936 [citation omitted]. See also *Duberstein v. Werner,* 256 F.Supp. 515 (E.D.N.Y.1966), (transfer avoided because of transferor's position as insider with control over the corporation's finances); *Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dept.1978) (good faith lacking where advantage accrues to officer, director, or major shareholder of corporation over rights of other creditors). The case of *Julien J. Studley, Inc. v. Lefrak,* 66 A.D.2d 208, 412 N.Y.S.2d 901 (2d Dept. 1979), *aff'd.* 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979), states with precision what occurred in the case at bench: "The manipulation of corporate assets by the respondents [officers] in the face of the petitioner's [creditor's] rights by preferring the interests of those in control of the corporation reflects bad faith and deprives the respondents of the status of transferees for fair consideration." *Id.* at 215, 412 N.Y.S.2d 901, *cited with approval* in *In re Checkmate Stereo & Electronics, Ltd.,* 9 B.R. 585 (Bankr.E.D.N.Y.1981) at 618.

As an insider with a fiduciary obligation to Purco's other creditors, Coon's conduct carried none of the earmarks of an arm's length transaction and was lacking in good faith. From the inception of the business, the clear intent of Marlin Coon was to launch the business with substantial apparent assets, while contributing no capital. He intended from the beginning to have a lien on all corporate assets to secure the $135,000, which he "loaned" the new company for it to commence operations. He thought it fair business practice to launch an operating business with apparent substantial assets, retaining for himself the right to reap the gains and profits, but with only outside creditors taking the risk. Only by inadvertence did he fail to acquire his blanket liens at the inception of the new venture. When it became apparent that the new business was failing, he became more diligent in engaging counsel to prepare the papers to secure repayment to himself and no one else. In short, it was unadorned self-dealing. Therefore, the conveyance of the security interest in Purco's assets was given without fair consideration, lacking as it was in good faith, and must fail as a fraudulent conveyance under § 354.

### B. Section 355

The transfer of the security interest, when finally accomplished in 1982, left Purco with an unreasonably small amount of capital. The transfer is accordingly fraudulent under § 355 of the Act which provides:

Every conveyance made without fair consideration, when the person making it is engaged, or is about to engage, in a

business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuation of such business or transaction, without regard to his actual intent.

We have already found that there was not fair consideration for the transfer of the security interest. We also concluded that Purco was insolvent before and after the transfer. A finding of insolvency is *ipso facto* a finding that the Debtor was left with unreasonably small capital after the conveyance, *United States v. Gleneagles Inv. Co. Inc.*, 565 F.Supp. 556 (M.D.Pa. 1983). To say that the giving of the security interest left the debtor in this case with an unreasonably small amount of capital is an understatement. It virtually left the debtor with no capital in that there were no unencumbered assets after Coon got the security interest. We conclude the transfer was a fraudulent conveyance under § 355.

### C. Section 357

Finally, we view the granting of the security interest in the debtor's assets as a fraudulent conveyance under § 357 which provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud, either present or future creditors is fraudulent as to both present or future creditors.

This section, unlike the two sections previously discussed which operate irrespective of the transferee's intent, requires that the transferee actually intended to defraud his creditors. Actual intent is frequently difficult to discern. Rarely does the individual seeking to benefit himself declare his intention to engage in a fraud. The intentions and motivations of such a person must therefore be inferred from his conduct. In this regard the behavior of insiders or those who exert considerable influence over the affairs of a corporate debtor should receive rigorous scrutiny. "Circumstances from which courts have been willing to infer fraud include ... the fact that the transferee was an officer or was an agent or creditor of an officer of an embarrassed corporate transferor." 4 *Collier on Bankruptcy*, ¶ 548.02 (15 ed. 1985). *See also Duberstein, supra,* where the court held that the delivery of a chattel mortgage to a corporate officer in repayment for loans made by the officer to the debtor was fraudulent. (The court there also found that the loans there were actually contributions to capital.) Additional support for finding actual intent when the transferee is an insider is found in *In re Vaniman Intern, Inc.,* 22 B.R. 166 (Bkrtcy.E.D.N.Y. 1982). The court there said "where the transferee is in a position to dominate or control the debtor's disposition of his property, the transferee's intent to hinder, delay or defraud creditors may be imputed to the debtor." *Id.* at 182.

Purco's initial capitalization was nil. By 1982 Purco was having difficulty staying ahead of its creditors. Evidence and testimony show that, sensing the impending demise of the company, Coon took a blanket security interest in all of Purco's tangible personal property. At that time it had substantial liabilities, little or no cash on hand, and inventory of little value. Yet rather than discharging his fiduciary obligations to Purco's other creditors, as President and Secretary of Purco, Coon chose to favor himself with a blanket security interest in the only items which might have been available to satisfy Purco's creditors. Worse still, he did so when he exercised complete and autocratic control over the debtor, as indeed his counsel acknowledged to the court when he argued that Coon and Coon alone had corporate authority to grant the security interest. *United States v. Gleneagle Inv. Co., supra,* stands for the proposition that where the transferree knows of the claims of creditors and knows that creditors will not be paid after the transfer, the court may infer that the transferee intended to hinder, delay or defraud creditors. *Id.* at p. 580. In the case at bar, actual intent to defraud creditors is apparent. In Coon's capacity as President, he knew too well of Purco's other creditors.

He did not merely believe creditors would not be paid on their claims, it was his design and intention to insure that they would not. The trustee may therefore defeat the security interest under § 357. We conclude that the granting of the security interest was a fraudulent transfer under Sections 354, 355 and 357. Accordingly, the trustee may avoid the transfers by virtue of 11 U.S.C. § 544(b). This conclusion renders unnecessary our consideration of whether the transfer may have been invalid as contrary to applicable principles of corporation law.

## II. Equitable Subordination of the Claims of Coon and Coon Refrigeration

Equitable Subordination of the Claims of Coon and Coon Refrigeration.

■ Statutory authority for the subordination of the claim or claims of one creditor to those of another is found at 11 U.S.C. § 510(c) which provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

It was intended with the enactment of this provision that the concept of equitable subordination be left to case law interpretation. *See, e.g.,* (124 Cong.Rec. H 11095 [daily ed. Sept. 28, 1978]; S 17412 [daily ed. Oct. 6, 1978]). The cases have formed a tripartite test. The three elements of a subordination case are:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*In re Multiponics,* 622 F.2d 709 (5th Cir. 1980). *See* also *In re N & D Properties, Inc.,* 54 B.R. 590 (D.C.Ga.1985); *In re Americana Apparel, Inc.,* 55 B.R. 160 (Bkrtcy.E.D.Pa.1985). Where the claimant is a fiduciary of the debtor, the courts have generally required a showing of fraud, overreaching, inequitable conduct or, in some instances, the violation of the rules of fair play and good conscience by the claimant, in order to warrant subordination of a particular claim, *In re Americana Apparel, Inc., supra.* The Supreme Court explained in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939):

A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their powers are powers in trust. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally the fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee for that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders. *Id.* at p. 306, 60 S.Ct. at 245.

The court's reasoning is more compelling in the case of a sole director or controlling stockholder. The Supreme Court also said in *Twin-Lick Oil Co. v. Marbury,* 91 U.S. (1 Otto) 587 (1896) at page 590: "If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his

acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness."

█ Accordingly, we hold that the trustee may subordinate the claim of an officer, director or shareholder, who is also a creditor, in control of a corporation to the claims of unsecured creditors where there is clear and convincing evidence that the officer, director or shareholder used his insider status to his benefit by over-reaching or self-dealing. Coon undercapitalized Purco from its beginnings and refused to infuse sufficient capital even when the necessity for cash was apparent. Indeed, Coon was forced to seek advice of counsel and accountants for suggestions on how to save the floundering company and as his and Purvis's testimony revealed, their advisors told them "infuse capital." By the time the company was hopelessly insolvent, he conveyed to himself a blanket security interest in virtually all of the assets held by the debtor. A more egregious example of self-dealing could scarcely be conceived.

### III. Unauthorized Postpetition Sale

█ We turn our attention to whether the trustee can recover the proceeds from the sale of the GMC truck after the filing of the bankruptcy. The GMC truck was part of the initial capitalization and was employed in the operation of Purco's business. Its value was included in determining the debt owed by Purco of $135,000. Title was retained by Coon only because a formal transfer would have necessitated payment of a 6% transfer tax. Coon might argue that retention of legal title was equivalent to taking a security interest in the GMC truck. Coon's argument fails for the same reason his blanket security interest in all other of debtor's assets fails— lack of good faith as set forth above. Accordingly, the lien and debt interest of Coon in the GMC truck and its attached equipment, and proceeds of sale thereof, will be subordinated to the claims of other creditors. The proceeds of the sale ($21,-320.00) will be ordered to be paid over to the trustee.

### IV. Abandonment

The Trustee has moved the court for an order permitting him to abandon certain inventory presently located on wooded real estate at 8164 Pagan Road, Erie, Pennsylvania. The real estate is owned by Coon Refrigeration. The inventory or its predecessor was at this location prior to the incorporation of Purco, when the business was operated as a division of Coon Refrigeration. The security interest did not specifically cover inventory. Even if it had, as a consequence of the determination that the security interest was invalid as a fraudulent conveyance under state law and that any claims of Coon and Coon Refrigeration on any of the Debtor's assets were subject to equitable subordination under the Bankruptcy Code, the inventory would nevertheless be available for the Trustee to liquidate for the benefit of general creditors.

The Trustee asserts that the inventory is or may be hazardous waste and that the cost of removing or otherwise disposing of the waste will exceed its value. If this is so, naturally the inventory would be burdensome to the estate. The Defendants concede, in fact, insist, that the inventory was not covered by the security interest. Defendants also do not dispute that the inventory is hazardous waste or that the costs of removing it or disposing of it will exceed any possible value it may still have. Rather, the Defendants deny that the Trustee may abandon the hazardous waste and cite as the sole authority for their position the case of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

The inventory consists, as nearly as can be gathered, of approximately eighty drums of cut-back asphalt, used to tar and chip roads, and a number of five gallon cans, some of which may have been transferred to fifty-five gallon drums, which contain cut-back asphalt but also contain various thinners, including urethane and toluene. Testimony indicated that there may be as many as 200 drums in total

inventory and that some of the drums may leak.

On September 24, 1984, as a result of staff inspections conducted on September 10, 12, and 18, 1984, the Commonwealth of Pennsylvania, Department of Environmental Resources ("DER") issued a Notice of Violation ("Notice"). The Notice cited Coon Refrigeration, Coon, Purvis, and the Trustee for the operation and maintenance of an unpermitted solid waste disposal site in violation of several applicable provisions of the Pennsylvania Solid Waste Management Act, 35 P.S. 6018.101 et seq. and Hazardous Waste Rules and Regulations and Rules and Regulations for Solid Waste Management promulgated by the DER pursuant to authority granted it under the Solid Waste Management Act. The Notice also instructed the parties to take various steps to abate the violations, none of which were taken to this Court's knowledge. The only evidence of the costs likely to be incurred in complying with the DER directives was the testimony of Coon that the freight and incineration of the waste would cost between $150 and $200 per drum, or a total cost based on 200 drums of between $30,000 and $40,000. The Court has not been informed of any costs incurred to date by the DER and the DER has not filed a proof of claim in this case nor entered an appearance. The court was advised at argument that the DER has sealed the leaking drums in oversize containers.

The Trustee's authority to abandon property determined by him to be burdensome to the estate is found at 11 U.S.C. § 554:

(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(c) Unless the court orders otherwise, any property scheduled under section 521(a)(1) of the title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

In *Midlantic*, the Supreme Court stated that: "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.*, 106 S.Ct. at 762. It is thus now clear that there exists an exception to the trustee's power of abandonment. However, "This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm." *Id.* at 762–63 n. 9.

■ The effect of abandonment is that ownership and control of the asset is reinstated in the debtor with all rights and obligations as before filing a petition in bankruptcy, *Riggs National Bank v. Perry*, 729 F.2d 982 (4th Cir.1984), *In re Franklin Signal Corp.*, 65 B.R. 268 (Bkrtcy.D.Minn.1986). Such abandonment is to the person having the possessory interest in the property.

In the case of *In re Franklin Signal Corp.*, 65 B.R. 268 (Bkrtcy.D.Minn.1986), the bankruptcy court, in reviewing *Midlantic* concluded at page 272: "The trustee only needs to take adequate precautionary measures to ensure that there is no imminent danger to the public as a result of abandonment."

The state of Wisconsin, although aware of the presence of the drums containing the chemicals, had undertaken no action to clean up the site. The court inferred from the state's inaction that no imminent threat to the public existed. Having thus conclud-

ed that *Midlantic* did not absolutely preclude abandonment of hazardous waste by the trustee, the court in *Franklin Signal* fashioned a five factor test to be applied case by case before a bankruptcy court may permit abandonment: (1) the imminence of danger to the public health and safety, (2) the extent of probable harm, (3) the amount and type of hazardous waste, (4) the cost of bringing the property into compliance with environmental laws, and (5) the amount and type of funds available for cleanup."

A less restrictive reading of *Midlantic* was also adopted in *In re Oklahoma Refining Company*, 63 B.R. 562 (Bkrtcy.W.D. Okla.1986). There the debtor had operated a crude oil refinery for 65 years prior to the bankruptcy at the site which the debtor sought to abandon. The Oklahoma State Department of Health had issued directives and orders in response to samples showing that noxious substances were leaking into underground aquifers and resulting in contamination. The testimony showed that the contamination of the aquifer posed a substantial and certain threat to drinking water but which threat might not manifest itself until many years in the future. The trustee was in compliance with all consent agreements and orders but was not able to propose a satisfactory closure plan for the site because any closure plan did not include a cleanup. The bankruptcy judge found it significant that the secured creditor had already consented to the use of cash collateral by the trustee to comply with the state agencies and to minimize the possibility of future harm, including the removal of remaining waste, the monitoring of wells, and the request for an environmental report. The report concluded that a cleanup might cost $2.5 million and require 30 years of monitoring. The trustee estimated the value of the estate at $4 million with none of the assets being unencumbered. The estate was in fact subject to $40 million in secured claims and another $8 million in unsecured claims.

The bankruptcy court characterized the trustee's quandary as follows:

"The trustee thus finds himself confronted with a formidable dilemma. On the one hand, he has no funds which are not cash collateral but, under a strict reading of *Midlantic* could be required to comply with state laws and regulations which is impossible because of § 363(c)(2). 11 U.S.C.A. § 363(c)(2). We do not believe the Supreme Court intended to place bankruptcy trustees in such a predicament but rather that *Midlantic* requires the bankruptcy court, in determining whether to permit abandonment, to take state environmental laws and regulations into consideration."

■ In addition to the two foregoing bankruptcy court decisions, we find support for a less severe reading of *Midlantic* in the opinion itself wherein the Court instructed that the trustee's petition to abandon will be denied *unless* (emphasis added) the trustee has "formulat[ed] conditions that will adequately protect the public's health and safety," *Midlantic, supra,* 106 S.Ct. at 762. The necessary corollary to this passage is that abandonment will be permitted when the conditions are such that abandonment will not render the public health and safety inadequately protected.

■ We have no qualified testimony that the inventory is hazardous waste, but assuming the inventory here to be hazardous waste, there is no showing that the public health and safety are not adequately protected, nor is there a showing of a clear and imminent danger nor does there appear to be any great risk of harm or threat to public safety, either immediate or in the foreseeable future. The court infers from the DER's lack of interest in this proceeding that there is no threat to the public health or safety which warrants DER's participation. Also, there is no showing that the landlord/landowner (Coon Refrigeration), which will be in possession of such inventory upon abandonment, is not capable of any remedy which may be necessary to adequately protect the public.

There is no evidence showing how much of the contaminated inventory on the premises of Coon Refrigeration was left there by the debtor or how much originated with

the Coon Refrigeration *division* which previously operated the same business. It may consist of some of each. In our view, it makes no difference. The trustee will be permitted to abandon all of such inventory, irrespective of its original source.

An appropriate order was entered June 30, 1987.